UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
PRIVATE ONE OF NEW YORK, LLC,

                    Plaintiff,

   -against-                                 **MEMORANDUM AND ORDER**

JMRL SALES & SERVICE, INC., d/b/a              06-CV-549 (SLT) (RLM)
CRAFTSMEN LIMOUSINE and
SPECIALITY BUS MANUFACTURERS, LLC,
SUBURBAN TRAILS, INC., and COACH USA,

                    Defendants.
----------------------------------------------------------------x

**TOWNES, United States District Judge:**

        Plaintiff, Private One of New York, LLC, initially commenced this action in the Supreme Court of the State of New York, Kings County, alleging that defendant JMRL Sales & Service, Inc., d/b/a Craftsmen Limousine and Speciality Bus Manufacturers, LLC ("JMRL"), breached certain agreements by selling buses to Coach USA and refusing to sell them to plaintiff. Defendants subsequently removed this action to this Court, and JMRL now moves to dismiss the claims against it pursuant Rule 12(b)(3) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1406(a) or, in the alternative, to transfer this action pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the Western District of Missouri. In addition, JMRL requests that this Court award it attorneys' fees in accordance with the terms of the agreements between plaintiff and JMRL.

        For the reasons set forth below, plaintiff's claims against JMRL are dismissed without prejudice. JMRL's motion for attorneys' fees is denied, but JMRL is granted permission to file a counterclaim against plaintiff within thirty (30) days of the date of this Memorandum and Order.

# BACKGROUND

In conjunction with another corporation, plaintiff operates CitySights N.Y. LLC ("CitySights"), a bus company that offers tours of New York City. Verified Complaint at ¶¶ 5-6. CitySights uses open-air "top decker buses" – double-decker buses in which most or all of the seating is on the upper deck. *Id.* at ¶ 7. Gray Line, Inc., which is wholly owned by defendant Coach USA, is CitySights' main competitor. *Id.* at ¶ 7.

In November 2004, plaintiff entered into a contract with JMRL for the manufacture of a new type of top decker bus, dubbed "The Roman Chariot." This contract, which is attached to the complaint and referred to therein as "Agreement One," consisted of two parts: a three-page document entitled, "Agreement to Construct Sightseeing Bus," and a three-page addendum entitled, "Terms Sheet." In the first part, JMRL agreed to build a single prototype of "The Roman Chariot," and plaintiff agreed to pay a total of $220,000 – a $50,000 deposit and $170,000 after the bus was manufactured. This part consisted primarily of a list of specifications, but included some warranty provisions.

The second part provided, *inter alia*, that plaintiff would have the option to reject the prototype or to order additional buses. Specifically, the Terms Sheet required JMRL to deliver the prototype to plaintiff's Brooklyn, New York, offices by December 21, 2004, where it could be inspected by plaintiff and its "booking agents." Terms Sheet (included in Ex. A to the Declaration of Zev Marmurstein (the "Marmurstein Dec.") and Ex. A to the Declaration of Robert M. Haswell (the "Haswell Dec.")) at ¶¶ 1-3. Plaintiff could then either accept the prototype and wire $170,000 to JMRL, or reject the bus and forfeit the $50,000 deposit (unless JMRL or plaintiff managed to sell the prototype within two weeks). *Id.* at ¶¶ 4-5.

In addition, the Terms Sheet gave plaintiff the option to purchase additional buses. It obligated JMRL to produce the first additional bus within five or six weeks after plaintiff agreed to purchase it and to deliver one bus per week thereafter or pay a penalty of $5,000 per bus. *Id.* at ¶ 7. The Terms Sheet did not limit the number of additional buses that plaintiff could order, but stated, "By April 01, 2005[,] JMRL will have delivered a total of 10 buses including prototype provided orders are given according to this schedule." *Id.*

The Terms Sheet also contained a restrictive covenant, which is central to this litigation. Entitled, "Right of First Refusal," this covenant provided:

> JMRL . . . and their agents, successors, and subsidiaries agree not to build or sell plans for a sightseeing bus with the open air raised platform design for anyone else in the state of New York other than Private One or their agents or their successors. This exclusive agreement will be voided should Private One cease to purchase their open-air sightseeing buses from JMRL . . . and are purchasing said buses from another manufacturer. JMRL . . . agrees to give Private One the first right of refusal for . . . the Roman Chariot and or any other open air raised platform bus prior to accepting orders from anyone else in the United States of America. This agreement will be voided should Private One attempt to use its terms to force a reduction in the amount agreed upon for the cost of . . . the Roman Chariot. JMRL . . . agrees to build all the buses ordered by Private One for a twelve month period from the date of execution of this agreement at the . . . price of $220,000.00. This price is fixed and agrees [sic] to no more than five percent increase in the 2nd twelve months from said date of this agreement.

*Id.* at ¶ 8.

After JMRL delivered a satisfactory prototype in December 2004, plaintiff decided to order six additional buses. Although plaintiff acknowledges that "Agreement One provided for . . . additional buses to be delivered," plaintiff maintains that "the parties instead worked on a separate second agreement for new buses." Plaintiff's Memorandum of Law in Opposition to Motion for Dismissal ("Plaintiff's Memo") at 4. On or about December 27, 2004, plaintiff and

3

JMRL negotiated a new "Terms Sheet" (hereinafter, the "Second Terms Sheet") which differed from the prior one in three significant respects. First, it omitted five paragraphs – paragraphs 2 through 6 – which related solely to the prototype bus. Second, instead of describing the manner in which the delivery schedule was to be calculated, it implicitly applied the scheduling provisions set forth in Agreement One and provided that if the contract was signed and plaintiff's deposit was received by January 3, 2005, plaintiff would receive the six additional buses by March 15, 2005. Second Terms Sheet (included in Ex. C to the Marmurstein Dec. and Ex. C to the Haswell Dec.) at ¶ 2.

Third, the Second Terms Sheet altered the purchase terms significantly. The original Terms Sheet contained "Purchase Terms on the prototype only," Terms Sheet at ¶ 1, and required a $50,000 deposit "to defray the expenses of JMRL . . . in developing this unique vehicle should Private One decide not to purchase this prototype bus." *Id.* at ¶ 6. Under the new terms, however, plaintiff was required to provide only a $20,000 non-refundable deposit, plus "a personal guarantee from Yakov (Jack) Marmurstein for an additional $30,000" for each bus. Second Terms Sheet at ¶ 1. The Second Terms Sheet provided that Mr. Marmurstein's guarantee would be provided "as per attached addendum." *Id.*

In all other respects, the Second Terms Sheet was almost identical to the prior one. The restrictive covenant contained in the new sheet was exactly the same as the one contained in the prior sheet, with two exceptions. First, the new version provided that the covenant would be voided only if plaintiff purchased "new" buses, rather than any open-air sightseeing buses, from other manufacturers. Second Terms Sheet at ¶ 3. Second, the new covenant included a sentence providing that if additional optional equipment was ordered by plaintiff, the parties would negotiate an increase in the price. *Id.*

On or before December 27, 2004, the parties drafted the addendum relating to Mr. Marmurstein's guarantee. This document, entitled, "Addendum to contract for the construction of Sightseeing buses" and hereinafter referred to as "the Guarantee," stated that, although JMRL wanted a deposit of $50,000 for each additional bus ordered, JMRL would accept a deposit of $20,000 per bus, plus the personal guarantee of one of plaintiff's shareholders – variously identified in the document as either Yakov (Jack) Mermurstein or Yakov (Jack) Marmurstein – to pay an additional $30,000 for each bus plaintiff ordered but failed to purchase. *See* Marmurstein Dec., Ex. B; Haswell Dec., Ex. B. The Guarantee also contained the following provision, which is central to JMRL's motion:

> Should there be any disagreement between said parties that requires litigation to settle said disagreement, Private One, and or Yakov (Jack) Mermurstein agree that they will be responsible for any legal fees necessary for all litigation, including such fees accrued by JMRL, and further agree that any litigation concerning the contract, or this guarantee shall be held in Christian County Missouri, and the laws of the State of Missouri shall apply.

*Id.*

The Guarantee was executed by plaintiff, JMRL, and the guarantor. Although none of the three dated the document, plaintiff concedes that Mr. Marmurstein signed the document on December 27, 2004. Marmurstein Dec. at ¶ 7. However, the Second Terms Sheet, which described itself as an addendum to "the Agreement to Construct 6 Sightseeing Buses known as the Roman Chariots," was not signed for another two weeks, when the parties executed the Agreement itself. This Agreement – like the first part of Agreement One – was entitled, "Agreement to Construct Sightseeing Bus," and consisted primarily of a lengthy list of specifications. *See* Marmurstein Dec., Ex. C; Haswell Dec., Ex. C.

5

In April 2005, following the delivery of the six buses contemplated by this second agreement ("Agreement Two"), plaintiff and JMRL entered into yet another agreement, this time for the construction of three additional buses. Like both of the previous agreements, it consisted of two parts: an "Agreement to Construct Sightseeing Bus," which primarily listed the specifications and provided warranty provisions, and a "Terms Sheet," which was nearly identical to that contained in Agreement Two. *See* Marmurstein Dec., Ex. D; Haswell Dec., Ex. D. This Terms Sheet contained the exact same restrictive covenant contained in Agreement One, except that it included the sentence added to that covenant by Agreement Two.

In June 2005, plaintiff and JMRL contracted for the construction of a single Roman Chariot with a translucent roof. As in the previous agreements, this contract consisted of an "Agreement to Construct Sightseeing Bus," and a "Terms Sheet." *See* Marmurstein Dec., Ex. E; Haswell Dec., Ex. E. Although the "Terms Sheet" was different from its predecessors in some respects – most notably in that it omitted a Delivery Schedule – the restrictive covenant contained therein was identical to that in the previous contract.

In January 2006, after building this tenth additional bus, JMRL refused to sell plaintiff any more buses. According to plaintiff, an officer of JMRL stated that JMRL was building open-air buses for Coach USA. Marmurstein Dec. at ¶ 12. Plaintiff asserts that these buses have since been delivered to Coach USA's subsidiary and plaintiff's main competitor – Gray Line, Inc. – which is using them to compete with plaintiff. *Id.*

In February 2006, plaintiff commenced this action in the Supreme Court of the State of New York, Kings County, by serving a summons and Verified Complaint on defendants. The Verified Complaint recounts the history between plaintiff and JMRL, characterizing Agreement One as separate and distinct from all subsequent agreements. In quoting at length from the

6

restrictive covenant, the complaint cites to "paragraph 8 of the Agreement," but does not define the term "Agreement." Verified Complaint at ¶ 21.

Although the restrictive covenant appears as paragraph 8 only in the original Terms Sheet and as paragraph 3 in all subsequent versions, the complaint does not state that this action is based solely on breach of Agreement One. To the contrary, the first cause of action seeks damages from JMRL for breaching "the restrictive covenants contained in the *Agreements*" by accepting orders from Coach USA. Verified Complaint at ¶ 42 (emphasis added). Similarly, the second and final cause of action seeks a permanent injunction prohibiting JMRL from selling "any vehicles in violation of the *Agreements*" and prohibiting Coach USA and Suburban Trails, Inc., from ordering and/or accepting any vehicles from JMRL. *Id.* at ¶ 49 (emphasis added).

Less than a week after this complaint was served, defendants removed this action to this Court, alleging that this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) by virtue of complete diversity between the parties. On February 16, 2006, this Court held a hearing on JMRL's motion to vacate a temporary restraining order which had been granted by State Supreme Court Justice Carolyn E. Demarest before the action was removed. At that hearing, this Court not only vacated the temporary restraining order, but, *sua sponte,* raised the issue of whether the choice-of-forum clause in the Guarantee required that this action be transferred or dismissed.

JMRL has not filed an answer or any counterclaims. Instead, JMRL now moves for an order dismissing the claims against it for improper venue or, in the alternative, transferring this action to the United States District Court for the Western District of Missouri. In addition, JMRL seeks to recover the attorneys' fees it incurred in defending this action, as provided in the Guarantee.

**DISCUSSION**

*JMRL's Motion to Dismiss*

Although JMRL bases its motion to dismiss this action on Rule 12(b)(3) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1406(a), JMRL's argument is not literally based on these provisions but is predicated on the existence of a valid forum-selection clause. JMRL's decision to proceed under Rule 12(b)(3) appears to be based on district court cases which have applied this rule. *See* JMRL's Memorandum in Support of its Motion for Dismissal ("JMRL's Memo") at 4-5 (citing *HongKong & Shanghai Banking Corp. v. Suveyke*, 392 F. Supp. 2d 489, 490-91 (E.D.N.Y. 2005)); *see also Person v. Google, Inc.*, 456 F. Supp. 2d 488, 492-93 (S.D.N.Y. 2006). However, while some courts in this Circuit have analyzed motions to dismiss based on a forum-selection clauses as if they were brought under Rule 12(b)(3), the Second Circuit has analyzed such motions under Rule 12(b)(1), *see, e.g., AVC Nederland B.V. v. Atrium Inv. P'ship*, 740 F.2d 148, 152 (2d Cir. 1984), and other Circuits have used Rule 12(b)(6). *See, e.g., LFC Lessors, Inc. v. Pacific Sewer Maintenance Corp.*, 739 F.2d 4, 7 (1st Cir. 1984).

In *New Moon Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24 (2d Cir. 1997), the Second Circuit acknowledged this split in authority, noting that the circuits had not reached "consensus . . . as to the proper procedural mechanism to request dismissal of a suit based upon a valid forum selection clause." *Id.* at 28. Recognizing that "there is no existing mechanism with which forum selection enforcement is a perfect fit," *id.* at 29, the Second Circuit "refused to pigeon-hole these claims into a particular clause of Rule 12(b)." *Asoma Corp. v. SK Shipping Co.*, 467 F.3d 817, 822 (2d Cir. 2006). Instead, it established a separate framework for analyzing these cases.

Under this framework, the moving party must first show evidence of "an apparently governing forum selection clause." *Id.* The burden is then on the plaintiff who brought suit in a forum other than the one designated by that clause "to make a 'strong showing' in order to overcome the presumption of enforceability." *Id.* (quoting *New Moon Shipping*, 121 F.3d at 29). That burden is "analogous to that imposed on a plaintiff to prove that the federal court has subject matter jurisdiction over his suit or personal jurisdiction over the defendant." *New Moon Shipping*, 121 F.3d at 29. In the early stages of litigation, such a plaintiff "need only make a *prima facie* showing by alleging facts which, if true, would support the court's exercise of jurisdiction." *Id.* (citing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)).

In analyzing that preliminary showing, "the facts must be viewed in the light most favorable to the plaintiff." *Id.* (citing *AVC Nederland*, 740 F.2d at 149). "A disputed fact may be resolved in a manner adverse to the plaintiff only after an evidentiary hearing." *Id.* (citing *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986)). Accordingly, "a party seeking to avoid enforcement of such a contractual clause is . . . entitled to have the facts viewed in the light most favorable to it, and no disputed fact should be resolved against that party until it has had an opportunity to be heard." *Id.* Of course, if the parties agree as to all relevant facts, "the issue is one of law which the court must decide." *Asoma Corp.*, 467 F.3d at 823.

In this case, JMRL has met its burden of production by adducing evidence that the Guarantee included a forum-selection clause. Plaintiff does not dispute this, and concedes that its shareholder, Yakov (Jack) Marmurstein, signed the Guarantee on December 27, 2004. However, plaintiff contends (1) that the Guarantee did not apply to Agreement One and that this

9

action is brought solely pursuant to that agreement, and (2) that Mr. Marmurstein signed the Guarantee with the understanding that the forum-selection clause applied only to litigation relating to the Guarantee and the deposits.

With respect to plaintiff's first argument, the parties do not agree whether the Guarantee was meant to apply to Agreement One as well as to the subsequent agreements. This factual issue is not susceptible of easy resolution through reference to the language of the Guarantee or other agreements. The Guarantee itself states only that it is an addendum to an unspecified "contract for the construction of Sightseeing Buses." Although the only such contract in existence at the time Mr. Marmurstein executed the Guarantee was Agreement One, the Guarantee anticipated that the parties would enter into another "contract for JMRL to construct sightseeing buses." Indeed, the same day that Mr. Marmurstein signed the Guarantee, the parties drafted a "Terms Sheet" which incorporated the Guarantee by reference and was expressly designated as an addendum to Agreement Two. Viewing these facts in the light most favorable to plaintiff, this Court cannot conclude at this juncture that the Guarantee was meant to apply to Agreement One.

There is no need, however, to resolve this factual dispute. Even assuming that the Guarantee did not apply to Agreement One, this action was not – and could not – be brought solely pursuant to that agreement. Although the complaint in this case quotes the restrictive covenant contained in paragraph 8 of Agreement One, the complaint does not allege a breach of Agreement One alone. Rather, it alleges a "breach of the restrictive covenants contained in the *Agreements*." Verified Complaint at ¶ 42 (emphasis added). The term "Agreements" is not specifically defined, but it cannot be read as meaning only the initial "Agreement to Construct Sightseeing Bus" and the appended "Terms Sheet"; the complaint also refers to "the

Agreements' exclusivity provisions," *id.* at ¶ 44, and only the "Terms Sheet" contains such provisions. Moreover, the complaint specifically defines the term, "Agreement One," yet does not use that term in describing the "Agreements" which have allegedly been breached.

Furthermore, plaintiff could not bring this action pursuant to Agreement One alone, because that agreement was superseded by the subsequent contracts. "Under New York law, a subsequent contract regarding the same subject matter supersedes the prior contract." *Independent Energy Corp. v. Trigen Energy Corp.*, 944 F.Supp. 1184, 1195 (S.D.N.Y. 1996) (citing *Barnum v. Millbrook Care Ltd. P'ship*, 850 F.Supp. 1227, 1236 (S.D.N.Y.), *aff'd*, 43 F.3d 1458 (2d Cir. 1994)). This is true "[e]ven in the absence of an integration and merger clause," *Kreiss v. McCown De Leeuw & Co.*, 37 F. Supp. 2d 294, 301 (S.D.N.Y. 1999), since "[p]rior agreements . . . are deemed to merge and be subsumed in a later written agreement." *Independent Energy Corp.*, 944 F. Supp. at 1195 (citing cases).

Agreement One addressed the same subject matter as the subsequent agreements. Agreement One did not relate solely to the building of the prototype, but contained specific provisions relating to the building of additional buses. For example, Agreement One provided that if plaintiff agreed to purchase additional buses, JMRL would deliver them according to a detailed delivery schedule set forth in paragraph 7 of the Terms Sheet. The agreement also set a price for these buses, stating that JMRL would pay $220,000 for any buses ordered within twelve months of the execution of the contract and that this price would increase no more than five percent in the second year of the contract. Terms Sheet to Agreement One at ¶ 8. Plaintiff itself concedes that "Agreement One provided for . . . additional buses to be delivered," but maintains that "the parties instead worked on a separate second agreement for new buses." Plaintiff's Memo at 4.

11

Since this "separate second agreement" addressed the same subject matter as Agreement One, it superseded Agreement One. *See Kreiss*, 37 F. Supp. 2d at 301; *Independent Energy Corp.*, 944 F.Supp. at 1195-96; *Barnum*, 850 F.Supp. at 1236. Accordingly, plaintiff cannot bring this action pursuant to Agreement One. Plaintiff must rely on the subsequent agreements, each of which expressly incorporates the Guarantee.

Plaintiff's second argument – that Mr. Marmurstein signed the Guarantee with the understanding that the forum-selection clause applied only to litigation relating to the Guarantee and the deposits – is also without merit. The language of the Guarantee contains no such limitations. To the contrary, the Guarantee expressly provides that "any litigation concerning the contract, or this guarantee shall be held in Christian County Missouri."

"Where a 'contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.'" *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (citing *De Luca v. De Luca*, 300 A.D.2d 342, 342, 751 N.Y.S.2d 766, 766 (N.Y. App. Div. 2d Dep't 2002)); *see also Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*, ___F.3d___, 2006 WL 3848718, at *7 (2d Cir. Dec. 21, 2006)) ("When [contractual] provisions are unambiguous and understandable, courts are to enforce them as written."). The language of the Guarantee is unambiguous. Accordingly, this Court cannot consider evidence concerning Mr. Marmurstein's understanding or intent at the time he signed the Guarantee.

Since plaintiff has not made "strong showing" to overcome the presumption that the forum-selection clause in the Guarantee is applicable and enforceable, plaintiff's claims against JMRL are dismissed pursuant to Rule 12(b). This Court, therefore, need not address JMRL's

second, alternative argument for transferring this action to the United States District Court for the Western District of Missouri.

*JMRL's Motion for Attorneys' Fees*

In its final argument, JMRL seeks an order requiring plaintiff to pay its attorneys' fees in both this action and a related federal action currently pending in the United States District Court for the District of New Jersey: *Roman Chariot, LLC, v. JMRL Sales & Services, Inc.*, No. 06 CV 626 (MLC). Plaintiff responds by arguing, *inter alia*, that a provision requiring one party to pay another's attorneys' fees regardless of which party prevails in the litigation is "unconscionable," unenforceable under New York law, and in violation of "public policy." Plaintiff's Memo at ¶ 14. In addition, plaintiff argues that it is not even a party to the New Jersey action and that JMRL's request for attorneys' fees relating to the New Jersey action is "ludicrous." *Id.*

Although neither party has briefed the issue, this Court must first address the procedural question of whether, and under what circumstances, a court may award attorneys' fees to a party who has not filed a counterclaim. In many cases, claims for attorneys' fees must be made by motion following the entry of judgment. *See* Fed. R. Civ. P. 54(d)(2)(A). This motion requirement "does not, however, apply to fees recoverable as an element of damages, as when sought under the terms of a contract." Advisory Committee Notes to 1993 Amendments to Fed. R. Civ. P. 54(d)(2). "[S]uch damages typically are to be claimed in a pleading and may involve issues to be resolved by a jury." *Id.* Indeed, several Circuits, including the Third, Fourth, Fifth, Sixth and Eighth, have held that attorneys' fees are "special damages," as defined in Fed. R. Civ. P. 9(g), and must be "specifically stated." *See Bensen v. American Ultramar Ltd.*, No. 92 Civ. 4420 (KMW) (NRB), 1997 WL 317343, at *11 (S.D.N.Y. June 12, 1997). Although the Second Circuit has not so held, some district courts in this Circuit "have similarly classified attorneys'

13

fees as special damages." *See Southern Indus. of Clover, Ltd. v. Zenev Textiles, S.A.*, No. 02 Civ. 8022 (HB), 2004 WL 1444856, at *2 (S.D.N.Y. June 25, 2004) (citing *Bensen*, 1997 WL 317343, at *11, and *Marshall v. New Kids on the Block P'ship*, No. 91 Civ. 3905 (RPP), 1993 WL 350063, at *1 (S.D.N.Y. Sept. 8, 1993); *see also U.S. for Harbor Clean Corp. v. M. Zanis Contracting Corp.*, No. 95 Civ. 2318 (SJ), 1996 WL 560300, at *2 (E.D.N.Y. Aug. 28, 1996) ("Rule 9(g) . . . requires that special damages, including attorneys' fees, be pleaded specifically"). Although "[f]ailure to request items of special damage in the pleadings results in a waiver of the right to those damages," *Bensen*, 1997 WL 317343, at *10, some courts in this Circuit – principally relying on *Engel v. Teleprompter Corp.*, 732 F.2d 1238 (5th Cir. 1984) – have interpreted Rule 54(c) of the Federal Rules of Civil Procedure as permitting a party to request attorneys' fees for the first time after trial, provided that such late requests do not prejudice opposing parties. *See*, *e.g.*, *Southern Industries*, 2004 WL 1444856, at *2-*3; *Bensen*, 1997 WL 317343, at *12, n. 30; *Marshall*, 1993 WL 350063, at *1. Rule 54(c) provides, in relevant part, that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Under this rule, which "was primarily intended to alleviate the harsh rule that a meritorious plaintiff who pleaded for inappropriate relief would receive no relief at all," *Engel*, 732 F.2d at 1241, "[a] plaintiff is entitled to the relief justified by the facts proven at trial." *Trapani v. Consol. Edison Employees' Mut. Aid Soc'y, Inc.*, 891 F.2d 48, 51 (2d Cir. 1989).

While this line of cases permits a Court to award attorneys' fees to a defendant absent a counterclaim, it is of limited application. As the *Engel* Court itself observed, it is "the unusual case where a defendant will establish his right to some affirmative relief without asserting a

14

counterclaim." *Engel*, 732 F.2d at 1241. *Engel* was such a case; the validity and the interpretation of the contract providing for attorneys' fees "was never in dispute," *id.* at 1240, and "all of the elements justifying such relief were fully established before the district court." *Id.* at 1242. Moreover, the plaintiff himself had sought a fee award under the contractual provision, so "[t]he interpretation of this clause and its enforceability under [state] law were not in issue." *Id.* Indeed, "[o]nly the identity of the prevailing party had to be established before that party's right to [attorneys' fees] became manifest." *Id.* Under these circumstances, and in the absence of any prejudice to the plaintiff, the *Engel* Court held that "entertaining the fee application [was] mandated by Rule 54(c)."

Similarly, in *Capital Asset Research Corp. v. Finnegan*, 216 F.3d 1268 (11th Cir. 2000), the Eleventh Circuit permitted a defendant to recover attorneys' fees, despite the fact that the defendant had not requested such fees in its pleadings. In so doing, the Court was careful to note that "the same factors present" in *Engel* were also present in *Finnegan*, stating:

> [A]lthough Finnegan did not seek attorneys' fees in its pleadings, the contract was in evidence and expressly provided for attorneys' fees for the prevailing party, and only the identity of the prevailing party had to be established before that party's right to attorneys' fees became manifest.

*Id.* at 1272. Accordingly, based on *Engel*, the Eleventh Circuit ruled that, "[u]nder the particular circumstances of [that] case," the district court had properly awarded Finnegan attorneys' fees. *Id.* at 1273.

This case, in marked contrast to *Engel* and *Finnegan*, is not an action in which a defendant has established its right to affirmative relief of any kind. There has not been a trial, so none of the elements justifying the award of attorneys' fees has yet been established. Moreover,

15

plaintiff's responsive papers raise an issue regarding enforceability: whether a provision requiring one party to pay the other's litigation expenses regardless of whether that other party prevails in the litigation is enforceable under state law or void as a matter of public policy.

The question of whether a party may recover attorneys' fees under the terms of a contract is a factual one, which must ordinarily be determined by the trier of fact. *See McGuire v. Russell Miller, Inc.,* 1 F.3d 1306, 1313 (2d Cir. 1993) ("when a contract provides for an award of attorneys' fees, the jury is to decide at trial whether a party may recover such fees"). Accordingly, in seeking attorneys' fees at this juncture and upon this record, JMRL is essentially requesting summary judgment with respect to an item of damages.

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). JMRL's showing in this case, however, is insufficient to meet that burden. Therefore, JMRL's application for attorneys' fees is denied.

While this Court declines to award attorneys' fees at this juncture, it does not wish to foreclose JMRL from seeking such fees. Because JMRL moved to dismiss pursuant to Fed. R. Civ. P. 12(b), it did not have a prior opportunity to file a counterclaim seeking attorneys' fees. Although this Court believes that such a counterclaim would best be raised and litigated in the Missouri action, this Court recognizes the possibility that plaintiff may not seek to pursue this matter further. Accordingly, this Court grants JMRL permission to file a counterclaim against plaintiff within thirty (30) days of the date of this Memorandum and Order.

## CONCLUSION

For the reasons stated above, plaintiff's claims against JMRL are dismissed without prejudice to refiling them in accordance with the forum-selection clause of the Guarantee. Defendant JMRL's motion to recover attorneys' fees incurred in defending this action is denied, but JMRL is granted permission to file a counterclaim against plaintiff within thirty (30) days of the date of this Memorandum and Order.

**SO ORDERED.**

/s/
SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
January 24, 2007